# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>vs.<br><br>JASMINE MORALES,<br><br>         Defendant.<br>_____<br>UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br>vs.<br>MOISES PATRICIO-GUZMAN,<br><br>         Defendant.<br>_____<br>UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br>vs.<br>RENE SANCHEZ-GOMEZ,<br>         Defendant. | RELATED CASE NOS.<br><br>13mj3858 BLM (LAB),<br>13mj3882 JMA (LAB)<br>13mj3928 BLM (LAB)<br><br>**ORDER DENYING EMERGENCY MOTION TO REVOKE DISTRICT-WIDE POLICY REGARDING SHACKLING OF PRETRIAL DETAINED DEFENDANTS; AND**<br><br>**ORDER DENYING APPEAL OF MAGISTRATE JUDGES' RULING AS TO DEFENDANTS MORALES AND PATRICIO-GUZMAN** |

**Preliminary Statement**

In these related cases, three Defendants represented by Federal Defenders of San Diego have challenged a new district court policy, effective October 11, 2013, that generally calls for deference to the U.S. Marshals on matters of courtroom security. The gist of the challenge is to the shackling of prisoners who often appear *en masse* before the magistrate judges during non-jury, pretrial proceedings, and in particular during guilty pleas. Defendants Morales and Patricio-Guzman are also appealing magistrate judges' rulings, pursuant to the Court's policy, denying their requests to be freed from restraints.

The underlying motion is styled "Emergency Motion to Revoke District-Wide Policy Requiring Five-Point Shackling of All Pre-Trial Detained Defendants Appearing in Magistrate & District Court." Individually, the Defendants in these three cases seek to be freed from five-point restraints, but the motion's caption is misleading because there is no policy requiring the shackling of all pretrial detained defendants.

The Court received briefing, and heard argument on Friday, November 15, 2013, at which time the Court denied the motion from the bench. This written order memorializes and supplements that oral decision.

At argument, the Court pointed out that large parts of the Emergency Motion's characterization of the policy, and framing of the issues, are incorrect. The policy does not, as the Emergency Motion would have it, require that every pretrial detainee **always** be held in five-point restraints when appearing before a judge. Rather, the new policy[1] generally defers decisions regarding the shackling of prisoners in non-jury proceedings to the Marshals, but directs that the Marshals remove arm and hand restraints during guilty pleas and sentencing hearings held before the district judges. Because the magistrate judges are frequently called upon to take guilty pleas from multiple defendants (up to six at a time) and to conduct other *en masse* proceedings, the policy does not direct the Marshals to remove restraints in proceedings before the magistrate judges. However, the policy also specifies

---

[1] The new policy is described in a letter sent October 11, 2013 by the Chief Judge of the District, to the local U.S. Marshal. (*See* Docket no. 8-1, Ex. H, in case 13mj3928.)

1  that any district or magistrate judge may, in individual cases, direct the Marshals to produce
2  a prisoner without restraints. Moreover, the policy does not prevent defendants from asking
3  a judge to remove the restraints, and in fact judges often accede to the requests. It is
4  conceded that at least one district judge has invoked the exception to order shackles
5  removed in every case before her. The policy does not, of course, apply to proceedings
6  before juries.

7  The restraints, the parties agree, consist of handcuffs which can be chained to a
8  waist-level "belly chain," as well as leg restraints. The chains on Defendants' feet are
9  between 12 and 18 inches long, which allows them to walk and move their feet around. The
10 restraints can be loosened if they are too tight, and it is conceded judges have ordered them
11 loosened.

12 Although a portion of the claims may appear to be moot, the Court finds that, as in
13 *United States v. Howard*, 480 F.3d 1005, 1009 (9th Cir. 2007), they fall within the "capable
14 of repetition, yet evading review" exception to mootness.

## Defendants' Challenge

16 Although Defendants argue that their claims arise from principles of substantive due
17 process, the Court finds that they are, in large part, Fourth Amendment claims. Most claims
18 concerning the confinement or restraint of pretrial detainees concern the seizure of their
19 persons, and thus arise under the Fourth Amendment, *see Graham v. Connor*, 490 U.S. 386,
20 388 (1989) (claims of unreasonable seizure of one's person should be analyzed under the
21 Fourth Amendment's "objective reasonableness" standard and not a substantive due
22 process standard), although claims that a pretrial detainee is being treated punitively are
23 Fourteenth Amendment due process claims. *Bell v. Wolfish*, 441 U.S. 520, 535 & n.16
24 (1979). *See also Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000) (discussing substantive
25 due process and Fourth Amendment claims). Claims that a detainees are unfairly prejudiced
26 during proceedings by the way they are presented (*e.g.*, in jailhouse clothing, or shackled)
27 are procedural due process claims. *See Howard*, 480 F.3d at 1012.
28 / / /

## Due Process

In *Deck v. Missouri*, 544 U.S. 622, 630–32 (2005), the Supreme Court held that detainees have both a Fifth and Fourteenth Amendment due process right not to be shackled in front of a jury. The Court emphasized the importance of the presumption of innocence, the right to a meaningful defense, and dignified proceedings, any of which shackles might threaten. Because shackles can be partially or wholly removed if they are interfering with a Defendant's ability to present his defense in some way (*e.g.*, by preventing the Defendant from writing notes or by causing the Defendant pain and confusion), there is no real danger of that here. Furthermore, the policy directs that the Marshals remove hand restraints during guilty pleas and sentencings, when defendants are most likely to need to use their hands or communicate with counsel, unless the Marshals are aware of a need to keep a particular defendant restrained. (*See* Chief Judge's letter at 2.)

Defendants also argue that shackling may lead to subtle or even subconscious judicial bias, but in pressing this argument they are essentially arguing the losing position in *Howard*. They argue that even though the policy relates to shackling in non-jury proceedings only, judges may be prejudiced by seeing them in restraints. *Howard* cites *United States v. Zuber*, 118 F.3d 101, 104 (2d Cir. 1997) for the principle that fear of prejudice is not an issue in pretrial proceedings before judges, because " a judge in a pretrial hearing presumably will not be prejudiced by seeing defendants in shackles." 480 F.3d at 1012. This aligns with the Court's experience, and with common sense. Judges are trained and presumed to ignore immaterial matters, such as how defendants are dressed or whether they are restrained. *See Zuber* at 104 ("We traditionally assume that judges, unlike juries, are not prejudiced by impermissible factors.") It is also true that judges routinely are aware of information about defendants both before and during trial that would be deemed unduly prejudicial if known to jurors, and yet are presumed not to be biased despite their exposure to such information.

The ubiquity of restraints also mutes their effect. Judges in this District and in various trial courts around the country routinely see defendants in restraints, so regularly, in fact, that it has become like "white noise." The fact that restraints are the norm and not reserved for

a disfavored few also strips them of any real significance to judges. The leg shackles, in fact, are not even visible to judges most of the time. This has led to the ironic spectacle of Federal Defenders lawyers having to ask defendants to stand up or to shift position to display them before arguing that the judge's newly-acquired knowledge of the restraints is unfairly prejudicial.

While shackles and similar restraints are not routine before juries, *see Deck*, 544 U.S. at 631, they are commonplace in non-jury proceedings. They are used in most if not all federal district courts. And in California state courts, where cameras are permitted, television news broadcasts commonly show defendants making their pretrial appearances not only shackled, but also in jailhouse garb and from behind a plexiglass barrier. When security precautions such as these are so common as to be routine, they cannot reasonably be considered a breach of decorum or a violation of courtroom dignity.

### Punitive Use of Shackling

If a particular restriction on pretrial detainees is "reasonably related to a legitimate government objective," it does not constitute punishment. *Bell*, 441 U.S. at 539. On the other hand, if the restraints are arbitrary or purposeless, it might reasonably be inferred that they are punitive. *See id.* But here, for reasons discussed more fully below, they are not.

The rationale behind the Court's policy regarding use of restraints is security, not punishment, and the policy cannot reasonably be construed as punitive in its intent or effect. Defendants rely on the fact that they are treated differently than in-custody material witnesses as support for their argument. But the distinction between the two groups is based on different security concerns, as well as an even greater solicitude for the release of witnesses as soon as possible. *See, e.g., Torres Ruiz v. U.S. Dist. Court*, 120 F.3d 933, 935–36 (9th Cir. 1997) (pointing out "tremendous hardship" suffered by material witnesses who are held in custody despite no criminal charges pending against them); 18 U.S.C. § 1344 (providing for the release of material witnesses if their testimony can be preserved by deposition). Moreover, the policy itself incorporates broad deference to the Marshals, and there are numerous exceptions to the use of shackling that are uncharacteristic of a punitive

1  policy. The Chief Judge's letter outlining the policy also discusses security needs, and how
2  shackling helps address those. Defendants' pointing to the theoretical possibility that
3  shackling could be used punitively provides insufficient reason to set aside the policy here.

### Fourth Amendment Claims

These are the heart of Defendants' claims. Defendants argue that because a liberty interest is at stake, the least restrictive means must be used, and that an individualized determination of dangerousness is required for each detainee to be made after an evidentiary hearing. They also argue that the evidence does not support a determination that shackling is necessary, and they maintain that the Court must rely on empirical and statistical data and analysis before making policy decisions implicating shackling. In fact, none of this is required.

The U.S. Marshals are charged with maintaining security in federal courthouses, and bringing detainees and prisoners to and from court for trials and other proceedings. See *Zuber*, 118 F.3d at 104. These duties include, among other things, preventing escapes; and preventing detainees from attacking each other, or from attacking others such as court staff, the public, or the Marshals themselves. Inherent in their authorization to move detainees and provide security is the authority to use reasonable force. *See Muehler v. Mena*, 544 U.S. 93, 98–99 (2005) (holding that, inherent in an authorization to detain a person is the authority to use reasonable force to effectuate the detention). The Court likewise has inherent authority to direct the Marshals and court security personnel to use reasonable force to maintain order and security and to ensure that proceedings are carried out in an efficient, orderly, and dignified manner. *See Chambers v. NASCO,* Inc., 501 U.S. 32, 43 (1991) (holding that courts possess the inherent authority to impose decorum in their presence); *In re Gustafson*, 650 F.2d 1017, 1024 (9th Cir. 1981) (citing *Ex parte Terry*, 128 U.S. 289, 303 (1888)) ("Federal courts have the inherent power to preserve order and decorum in court proceedings.")

Whether restraints such as handcuffs may be used to effect a detention is a Fourth Amendment question. *Muehler*, 544 U.S. at 99; *Albright v. Oliver*, 510 U.S. 266, 274 (1994)

(explaining that the Fourth Amendment addresses pretrial deprivations of liberty). The Fourth Amendment does not prohibit all seizures of persons, only unreasonable ones. *Maryland v. Buie*, 494 U.S. 325, 331 (1990). In determining reasonableness, the Court balances the intrusiveness of the seizure against legitimate governmental interests. *Id*. *Bell* itself also uses reasonableness as the standard against which searches and seizures of pretrial detainees is measured. 441 U.S. at 539–41. *See also Howard*, 480 F.3d at 1014 (upholding the shackling policy, noting it was adopted "following consultation with the Marshals Service to address legitimate security concerns" in the courthouse). Contrary to the Defendants' arguments, there is no "least restrictive means" requirement.

At argument, counsel for Federal Defenders suggested that because, in their view, circumstances were the same as in years past, the policy could not be made stricter. But, as explained in *Bell*, a restraint policy need only be based on some legitimate government interest. *See Bell* at 538. Even assuming, *arguendo*, there were no new information or developments, nothing prevents the Courts or the Marshals from reconsidering whether an existing policy might be improved. No showing of crisis or imminent breakdown of order is required.

The basis for Court's determination regarding the need for restraints is outlined in the Chief Judge's letter, and is also supported by other anecdotal evidence, individual judges' observations, and common sense judgements. The letter, among other things, cites a recent stabbing in recently retired Judge Irma Gonzalez's courtroom, an assault by one prisoner on another in the El Centro Magistrate Judge courtroom, and multiple incidents of prisoner-made weapons being found in holding cells.[2] This information was evaluated by the judges in light of the large number of in-custody prisoners the Marshals are responsible for (44,426

/ / /

/ / /

---

[2] At argument it was pointed out that detainees are searched <u>twice</u> before reaching these cells. The fact that detainees manage to smuggle weapons in even after these precautions had been taken underscores the fact that basic security precautions are insufficient to prevent detainees from attacking each other, and that additional measures such as shackling of detainees while in holding cells is needed.

court appearances, an average of 178 per day, in 2012), the number of available Marshals,[3] the physical layout of courtrooms and the courthouses, and the heightened need for security in proceedings involving multiple defendants.

The judges of this district also based their decision on their consultation with the U.S. Marshals Service. During one meeting, the U.S. Marshal for this District, Steven Stafford, discussed the changing demographics of criminal defendants in this District, including changes in the crimes charged and the defendants' violent histories. Individual judges' own experience, and anecdotal evidence also supports the conclusion that security needs have increased. This is illustrated by Judge Houston's order denying the appeal of the magistrate judge's shackling order in *Sanchez-Gomez*. Judge Houston points out that in years past, when many defendants were merely undocumented immigrant laborers, security was not so great a concern. (Docket no. 15 in case 13mj3928, at 1:27–2:3.) But with the emphasis on prosecuting defendants with violent or extensive criminal histories, and ties to gangs or drug cartels, the need for security has increased in recent years. (*Id*. at 2:2–3.) It also bears mention that in all cases governed by the policy, a magistrate judge or the federal grand jury has already determined that there is probable cause to believe that the defendant has committed at least one federal felony offense.

At argument, it was also pointed out that with the opening of the new courthouse annex in this District in December, 2012, the Marshals must now cover a larger area with the same number of staff. In general there are enough Marshals to provide security in courtrooms and to transport detainees up and down elevators between the large holding area in the courthouse basement and individual courtroom holding cells. But there are not

---

[3] At the hearing, Defendants argued that Congress cannot circumvent constitutional requirements by failing to provide funding or authorize staffing, and the Court agrees in principle with this. That being said, the practical limitations of providing security must play some role in the Court's and the Marshals' determinations. *See Bell*, 441 U.S. at 547–48 (explaining that courts must consider the realities of operating a detention center when examining the constitutionality of pretrial detainees' detention); *Howard*, 480 F.3d at 1014 ("We further note that understaffed security officers must provide courtroom security in a large and unsecured space.") The fact that some increase in comfort or some improvement in the treatment of pretrial detainees is theoretically possible does not mean it is constitutionally required. *See Bell* at 545–46.

enough Marshals to be present in each courtroom holding cell all the time; the cells instead are monitored by cameras so that Marshals can respond to security incidents there. Marshals must also respond to security incidents anywhere in the courthouse complex.

Time and manpower are also issues to be considered in the calculus of what is reasonable. It was established during the hearing that removing shackles ordinarily requires three Marshals, although it can be done with two if necessary. One, or ideally two Marshals stand guard to prevent attacks on the Marshal who is unlocking and removing the shackles, either by kicking, or by swinging hand shackles like a mace. The unshackling process takes between two and three minutes per detainee. In addition, as the Court noted, during a criminal calendar, practical considerations make it impossible to know the sequence in which each case will be called. On a typical calendar day, judges in this district routinely hear upwards of 20 cases or more. Requiring the unshackling of each defendant before the hearings, and re-shackling each one afterwards for safe transport, would result in delays of up to two hours. Besides eating up court time, defendants would be held in restraints longer (while waiting for their cases to be called) and their hearings would be delayed.

Another factor to be considered is the U.S. Marshals' Service's published, nationwide policy on shackling, a copy of which was provided to Defendants. This District, peculiarly, was out of step with that policy, and the Court concludes that the need for national consistency should also be considered in assessing the overall reasonableness of this District's revised policy. The risk of harm to detainees and others is minimized if the Marshals follow clear, uniform rules and observe routine procedures to secure prisoners and maintain appropriate control. *See Muehler*, 544 U.S. at 99 (citing *Michigan v. Summers*, 452 U.S. 692 (1981) for the principle that risk to all present is minimized if officers routinely exercise control of the situation by uniformly detaining occupants of places they search). Additionally, that this is a border district, where multiple defendants often enter pleas *en masse* before magistrate judges, and where many cases stem from activities of violent drug cartels, suggests a need for security that is at least as great as in other districts.

/ / /

1    Although the Court granted Defendants' discovery motion only in part, argument on
2 the motion in chief made clear why the broad discovery they sought was not needed. First,
3 as the Court noted at the hearing, there is a remarkable degree of agreement as to the facts
4 and reasons underlying the policy. Aside from the disagreement over the need for statistical
5 evidence, there was no fact, evidence, or information significant to Defendants' argument
6 that was not known. Although Defendants argued for a full evidentiary hearing, there was no
7 need for one because the Court accepted all of the parties' proffers. The evidence
8 Defendants sought would not have aided in the resolution of the constitutional issues that
9 they raised. This is consistent with the Ninth Circuit's approach in *Howard*, where the panel
10 approved the shackling policy at issue on the basis of even more generalized information.

11   Defendants argue that the necessity of shackling, and degree of detainee
12 dangerousness is required to be established by statistical evidence. Neither the Supreme
13 Court nor the Ninth Circuit requires this, and in fact such a requirement would contradict the
14 "reasonably related" standard applied in *Bell*. Furthermore, it is impractical; if courts were
15 required to base shackling decisions only on statistical or empirical evidence, hardly any
16 defendant could ever be restrained in any way. As a practical matter, it is impossible to
17 predict with certainty which defendants are violent or likely to attempt an attack. In this
18 Court's experience, criminal history documentation is typically both under- and over-
19 inclusive. It may capture some criminal activity that appears violent, but actually may not be
20 (such as a push or a shove charged as assault). At the same time, it often fails to reflect the
21 dangerous or violent way in which some facially nonviolent crimes are committed (such as
22 highly dangerous or even violent attempts to evade capture). Attacks are also committed by
23 detainees with no criminal history, such as those seeking to join gangs who are commanded
24 by gang leaders to attack a fellow detainee as an initiation rite. The attack in El Centro, for
25 example, was committed by a detainee with no criminal history at all, and no indicia of
26 dangerousness. And, while it is possible to separate known enemies, or separatees
27 (detainees such as suspected child molesters who are more likely to be attacked), attacks
28 / / /

may also occur when an attacker mistakenly misidentifies a fellow detainee as an enemy or as a separatee.

Additionally, because defendants are often present in court under emotionally-charged circumstances, they may behave unpredictably or irrationally. Besides fellow detainees, the most obvious targets for violence are the Marshals or court security officers who must remain in close proximity to them. But it is not unknown for defendants to attack others, even their own counsel, either out of frustration or to gain some perceived advantage such as new counsel or a mistrial. *See, e.g.*, Dana Littlefield & Greg Moran, *Defendant Slashes His Lawyer's Face in Court*, San Diego Union-Tribune, December 14, 2012, at B1.[4]

The Court also verified at the time of the hearing that not all security incidents are documented or reported. According to Supervisory Deputy Marshal Keith Johnson, who was present at the hearing, an intentional attack or the discovery of a weapon, for example, would ordinarily be documented. But by contrast, a detainee's brief struggle with officers or a detainee's throwing an object across the courtroom (a recent event in this Court) would typically not be documented. The underreporting of incidents that might suggest a tendency towards violence is another reason why statistical analysis by itself is insufficient, and why local judges', Marshals', prosecutors', and defense attorneys' own anecdotal experience and collective wisdom should reasonably be considered as they were here.

Requiring the Marshals to engage in the kind of statistical analysis Defendants advocate in order to justify the use of shackles is the kind of micromanagement that *Bell* explained was inappropriate. 441 U.S. at 547–48. The Marshals are familiar with the tasks of guarding detainees, maintaining courtroom security, and transferring detainees to and from court. It is reasonable for the Court to defer to their expertise in retaining control over the courthouse and especially the courtrooms. At the same time, the policy expressly permits judges to weigh the countervailing interests that the Defendants have identified, and to direct

---

[4] The article documents a recent and well-known attack on defense counsel (who happens also to be a member of this Court's CJA panel) that occurred in California state court. Despite being searched, the defendant had managed to smuggle a razor blade in his mouth. At the time of the attack, a jury and more than a dozen high school students on a field trip were present in the courtroom.

deviations from the policy in particular cases. *See Howard*, 480 F.3d at 1013–14 (citing *United States v. Mayes*, 158 F.3d 1215, 1226 (11th Cir. 1998)) (pointing out, with approval, that the shackling policy was instituted after consultation with the Marshals Service, on whose expertise the lower court was entitled to rely).

### Conclusion and Order

For all of the above reasons, the Court holds that this District's policy on shackling of pretrial detainees during non-jury proceedings, as outlined in the Chief Judge's letter, is reasonably related to legitimate government interests and does not violate Defendants' constitutional rights. Accordingly, the Emergency Motion is **DENIED**. Because the Court holds the shackling policy is constitutional, and because the magistrate judges did not abuse their discretion in applying it, the individual Defendants' appeals are **DENIED**.

**IT IS SO ORDERED**.

DATED: November 21, 2013

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge